IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 24, 2018

## MALCOLM ORLANDO WITHEROW v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 289761     Tom Greenholtz, Judge**

_____

### No. E2017-00512-CCA-R3-PC
_____

The Petitioner, Malcolm Orlando Witherow, appeals the Hamilton County Criminal Court's denial of his petition for post-conviction relief from his 2011 conviction for first degree premeditated murder and his life sentence. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Donna Miller, Chattanooga, Tennessee, for the appellant, Malcolm Orlando Witherow.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Neal Pinkston, District Attorney General; and Kristen Spires, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the Petitioner's fatally shooting Melissa Hoover, the Petitioner's former girlfriend. The Petitioner appealed his first degree murder conviction, and this court affirmed the conviction and summarized the facts of the case as follows:

> At trial, [Connie] Harrold testified that she had known Witherow for twenty years. She said the victim and Witherow stayed with her from time to time. On the morning of October 10, 2008, the victim, Witherow, and Tyler Baker, a friend of Harrold's son, were drinking coffee at Harrold's house. The victim went outside to roll up the windows of her car because it began to rain. Witherow followed her. As Witherow exited the house, he told Harrold, "I'm sorry I've got to break my promise, I love you, I'm sorry, Connie." When

asked what promise he was referring to, Harrold said, "[Witherow] promised me he would never hurt [the victim] in my house." She could not recall exactly when he had made that promise.

When Witherow and the victim were outside, Ms. Harrold heard loud noises, looked outside her window, and saw Witherow and the victim arguing. She said they were "slapping at each other but nothing really fist to fist or anything." She sat back down and heard another loud noise "like a gun." She then heard the victim "holler, 'Connie, Connie, help me. Help me, Mamma Connie, help me.'" She observed Witherow chasing the victim down the driveway, which she estimated was two or three hundred feet long. She told Baker, who was in the shower, to come outside because Witherow was shooting the victim. Harrold went outside and observed Witherow "walking on the other side of the road. . . . He was going past me, going back towards my house, and I'm going towards the other way." She said initially she could not see the victim but found her "on the side of the road. And I'm holding her in my arms and [Baker] comes out and I tell him to call 911." Harrold said the victim was "limp" and barely breathing. The victim had been shot several times and could not talk, because there was "a bullet penetrating out of her throat." Although Harrold attempted CPR on the victim, she died in Harrold's arms.

A recording of the 911 call was admitted into evidence and played for the jury. During the call, Harrold said that "Malcolm" shot the victim with a "small pistol" and "took off." When asked why Witherow would be angry with the victim, Harrold said that the victim "wore a wire on him several years back" as an informant for the police in a drug case.

On cross-examination, Harrold explained that Witherow made his promise "over a conversation about [the victim] wearing a wire," and that "he was going to retaliate against [the victim] or something. But he promised he wouldn't do it at my house." On the day of the offense, Witherow had been living at Harrold's house for several months, and the victim had been living there for a couple of weeks. Witherow and the victim slept in different areas of her three bedroom house and "were always friendly with each other for the most part." She had never observed Witherow or the victim with a gun. The night before the offense, the victim spent the night at Harrold's house, and Witherow spent the night elsewhere, which was not unusual.

According to Ms. Harrold, on the morning of the offense, Witherow returned to her house at around 7 a.m. She explained that she could not

-2-

remember every detail concerning that day because it had occurred over three years ago. Although she did not recall whether Witherow had a forty-ounce can of beer in his hand that morning, she agreed that it was not uncommon for Witherow to drink alcohol in the morning. She also did not recall smoking marijuana with the victim that morning but agreed that they had done so prior to the offense. She had observed Witherow and the victim argue prior to the offense, but she had never observed Witherow strike the victim. She testified that Witherow told her that he was going to hurt the victim "probably a few months" before the offense, but she never thought Witherow would hurt the victim. Finally, Harrold agreed that she did not see Witherow with a gun on the day of the offense.

Mr. Tyler Baker, a friend of Ms. Harrold's son, testified that he was living with Harrold on the day of the offense, and had known the victim and Witherow for "just a couple of months." On the morning of the offense, Baker said the victim had agreed to drive him to a job interview. He was sleeping on a chair by the front door when he saw Witherow enter Harrold's house. He fell back asleep, and nothing unusual happened until he was in the shower and heard gunshots. He initially thought it was a car, but then he heard screams. He walked outside and saw Witherow walking up the driveway "just real calm" with a small silver gun in his right hand. Baker testified that Witherow "looked at me and I asked him what happened and he just didn't say nothing. He just got in the car and left." Baker called 911, handed Harrold the phone, and ran to help the victim.

Baker testified that Witherow told him several times a week that the victim had "wor[n] a wire on him." Baker said that Witherow told him the investigation "made him lose everything . . . . he wanted revenge." Witherow also told Baker he was going to kill the victim and that he would "get away with it . . . . [and] do a year and a half . . . . at a crazy house."

On cross-examination, defense counsel asked Baker, "isn't it in fact the case you lived at Ms. Harrold's house for about a month and a half prior to October 10th?" He answered "yes" but later clarified that by October 10, 2008, he had been staying at Harrold's house "on and off" for "five to six months." Baker met Witherow and the victim when they came to stay with Harrold about three months before the offense. He agreed that Witherow came to live at Harrold's house before the victim. He thought that the victim lived at Harrold's house for "maybe a month" prior to the offense. He said Witherow did not get drunk every night. Prior to the offense, Baker observed Witherow and the victim argue, but had never observed them in a physical

confrontation. He thought their arguments occurred because the victim did not want to have a relationship with Witherow.

When asked whether the victim showed him a gun, Baker said, "I want to say she had one. This was weeks before it happened. But I can't remember." Baker testified that the victim had a gun in a brief case in the trunk of her car and sold it "probably a week" before the offense. He said the gun was "probably a .22" and described it as small and silver. Baker said Witherow also showed him two guns, a black revolver and a silver gun, a week before the offense. He did not observe Witherow hunt animals or shoot the guns around Harrold's property. Asked whether Witherow threatened the victim in her presence, Baker said[,] "Maybe sometimes. Sometimes she didn't worry about it; sometimes she thought he was just talking."

Sergeant Dean Beverly of the Cleveland Police Department testified that he investigated Witherow in 2005 for drug trafficking in Bradley County. He utilized the victim as a confidential informant in two controlled drug purchases from Witherow. He confirmed that the victim wore a wire during the investigation. Witherow was subsequently arrested and charged with the sale and delivery of Schedule II narcotics. The charges were eventually dismissed because the State was unable to locate the victim to testify at trial. On cross-examination, Sgt. Beverly said he did not know whether Witherow knew the victim had served as a confidential informant in his case. He explained, under normal circumstances, that information was provided to a defendant by the District Attorney General's Office upon request through discovery.

The director of admissions at Moccasin Bend Mental Health Institute testified that on the day of the offense, she was summoned to the admissions area of the hospital to meet Witherow. She asked how she could help him, and Witherow replied, "that he wanted to be evaluated. Said he had shot his girlfriend." Witherow told her he had thrown the gun in the river. The director called an admitting physician, the hospital attorney, and the police department. The director described Witherow as "tearful" and "unkept." She did not detect an odor of alcohol about his person, and he appeared to understand her questions. Witherow was evaluated by a physician, but he was not admitted to the mental hospital.

Detective Mark Miller of the Hamilton County Sheriff's Office identified photographs he took of Witherow's car parked outside of the mental hospital, which were admitted as exhibits. Witherow's car was towed to the Sheriff's Office and preserved in a secure area. On cross-examination, he

-4-

stated that he followed the car to the Sheriff's Office and was present when it was unloaded, but he did not search it because he did not have a search warrant.

Detective Robin Langford of the Hamilton County Sheriff's Office identified photographs and a diagram of the crime scene which were admitted as exhibits. He described what he believed to be droplets of blood at the scene and the location of the victim's body. He also identified swabs of suspected blood, a set of keys found in the street, and two Winchester .25 caliber spent shell casings retrieved from the scene, which were also admitted into evidence. Photographs of Witherow's car, which was processed for evidence after a search warrant was obtained, were also identified and admitted into evidence. Finally, Detective Langford identified a gunshot residue kit and the samples he obtained from Witherow's car. These items were forwarded to the Tennessee Bureau of Investigation for analysis and admitted as exhibits at trial.

Detective Rick Whaley of the Hamilton County Sheriff's Department was the case agent assigned to investigate the victim's death. He said a handgun was never recovered in the case despite the search efforts of a dive team. Detective Whaley identified Witherow's clothing, admitted as an exhibit, that was collected at the police annex. He observed other [detectives] take a buccal swab of Witherow's mouth pursuant to a search warrant. Detective Whaley identified these swabs, which were entered into evidence. He also observed Dr. Frank King's autopsy of the victim. He identified fingernail clippings, a blood sample, and a bullet he obtained from the victim's autopsy, all of which was sent to the Tennessee Bureau of Investigations for analysis. Detective Whaley said the victim's body was found "a little over a hundred yards" from the bottom of the driveway.

On cross-examination, Det. Whaley said Witherow's hands were tested for gun[]shot residue at the police annex on the day of the offense. He was unable to determine the position of the shooter or the victim at the time she was shot.

Dr. Frank King, the Hamilton County medical examiner, performed the autopsy of the victim and testified as an expert in forensic pathology. He identified the autopsy report and his report of investigation, which were admitted as exhibits. He said the victim's cause of death was multiple gunshot wounds, and the manner of death was homicide. He said the "gunshot wounds passed through the chest, abdomen, and right arm, . . . causing damage to

-5-

internal organs, bleeding, and subsequent death." He found fresh and old bruises on the victim's legs. Dr. King explained that a bullet wound consists of "entrances, exits, and graze wounds." He determined that six or seven bullets struck the victim, creating fourteen different gunshot wounds. He said the victim was alive when each bullet entered her, and "[a]ll of these gunshot wounds occurred close together in time." He opined that the victim was "going through different positions . . . [and] could be partly on the ground or all the way on the ground when some of these shots occurred."

Based on the similar appearance of the gunshot wounds, Dr. King opined that "the same gun or type of gun, same ammo[,] could cause all these similar looking wounds." He testified that the victim's wounds "all looked very similar, all caused by low velocity gunshot wounds." Finally, he stated that one bullet remained in the victim's body.

Special Agent Shelley Betts, a forensic scientist and firearms examiner with the Tennessee Bureau of Investigation, testified as an expert in the field of firearms identification. She found no gunshot residue on the victim's clothes and was unable to determine a muzzle-to-garment distance. She testified that the two fired cartridge cases she examined "had the same unique identifying marks[,] . . . so [she] was able to conclude that they had both been fired in the same .25 auto caliber pistol." Based on her testing, she further concluded that the bullet which came from the victim's body was a .25 caliber bullet.

On cross-examination, Agent Betts testified "there could have been any number of factors that would preclude [her] from determining a muzzle to garment distance." She said the gun could have been fired beyond "the maximum distance at which that gun and that type of ammunition would deposit gunshot residues on an item of clothing." Or, she said, the residue could have been lost and "environmental factors like a lot of mud or rain or a lot of blood could have destroyed [gunshot residue] evidence." She was unable to determine whether the bullet and shell cases were fired from the same gun because a gun was not recovered. She said "[t]here could have been one or two guns used in this case."

Special Agent James Russell Davis, III, of the Tennessee Bureau of Investigation[] testified as an expert in the field of microanalysis in trace evidence. He identified his report on the gunshot residue kit performed on Witherow's hands. Although the test was inconclusive for gunshot residue, it did not eliminate the possibility that Witherow could have fired, handled, or

-6-

was near a gun when it fired. Agent Davis also identified his report analyzing the evidence retrieved from Witherow's car. His test revealed the presence of particles unique to gunshot primer residue on a sample from Witherow's driver's seat belt or pull strap. Agent Davis said this indicated that a weapon was fired in close proximity of that particular item or that it was transferred from someone's hands. Both of Agent Davis's reports were admitted as exhibits at trial.

On cross-examination, Agent Davis agreed that the elements lead, barium, and antimony can be naturally occurring. He reiterated, however, that the gunshot residue found on Witherow's driver's seat belt came from a weapon that was fired. He also agreed that this residue could have come from Witherow being near a gun when it was fired or handling a gun after it was fired.

Detective Brian Ashburn, called as a witness by Witherow, testified that he conducted an interview with Baker which was recorded. Detective Ashburn testified that during the course of the interview Baker said that he had lived at Harrold's house "for about one to one and a half months" prior to the offense. The corresponding portion of the recording was played for the jury and largely inaudible. Baker was heard to say "about a month and a half." Detective Ashburn also testified that during the same interview Baker told him that Witherow had been living with Harrold for "a few weeks" prior to the offense. The corresponding portion of the recording was played for the jury and, again, was largely inaudible. Baker was heard to say "could be . . . about a month. Because I know it was about a week or two weeks before that I moved in there. Because I'd just met him. I'd never met him before."

Detective Ashburn agreed that Baker told him during the course of the interview that Witherow would get drunk and talk about killing the victim. The corresponding portion of the recording was largely inaudible; however, Baker is heard to say "I mean, [Witherow is] always like saying I'm going to kill that b----, . . . . But I mean you know (inaudible) . . . . almost a week and a half but I won't go to jail because I (inaudible) about it." Another portion of the recording was played for the jury in which Baker said that Witherow and O'Donald left Harrold's house the night before the offense, and went to Meigs. Baker said Witherow and O'Donald arrived at Harrold's around 7 a.m. on the day of the offense and Harrold's son left around 8 a.m. Detective Ashburn agreed that Baker said Witherow had been out that night with O'Donald, rode in O'Donald's new car, and that Baker told him Witherow had been in Georgia with a girl two nights before the offense. The corresponding

portion of the recording was played for the jury in which Baker said "Like two nights before . . . [Witherow] went down to Georgia and had sex with some girl, and that's what was killing him in his mind. . . . I don't know what girl, I don't know anything. He was just using his cell phone so." Detective Ashburn agreed that Baker said Witherow threatened to kill the victim only when he was drinking or intoxicated but not when Witherow was sober. The corresponding portion of the recording was played for the jury in which Baker said "[Witherow] was never mad at [the victim] when he was sober. He just really didn't talk to nobody that much."

Detective Ashburn agreed that Baker did not say that he lived with Harrold longer than one and a half months during the course of the interview. Detective Ashburn testified that Harrold told him that when Witherow arrived at her home on the day of the offense he was intoxicated and had a forty-ounce can of beer in his hand.

Dr. Laura Boos of the Tennessee Bureau of Investigations testified as an expert in serology and DNA. She analyzed various items of evidence in this case and said that blood was found on Witherow's jeans and shoes but not on a belt, shirt, cell phone case, watch, rings, swabs from the roadway, or the two cartridge cases. Upon further testing, she found blood and DNA on three swabs from the roadway, and two of these matched the victim's DNA while the third had insufficient or degraded DNA and could not be matched. Dr. Boos tests also showed that the DNA on Witherow's shoes matched the victim's DNA. She explained that it is not uncommon for DNA to be undetected on shell casings, because the heat produced by the firearm degrades DNA. On cross-examination, she said that the blood on Witherow's jeans was his blood.

Witherow testified that he had known the victim for seven or eight years and Harrold for fifteen or twenty years. He said he had a romantic relationship with the victim, during which she lived with him. Their relationship ended two years before the victim's death. Witherow said the victim invited him to visit with her, but he declined. He said he allowed the victim to stay with him when she had nowhere else to stay. He said he brought the victim to Harrold's house to live, because he "didn't want to see her with nowhere to stay." He could not recall how long the victim lived with Harrold, but he knew it was more than a week.

-8-

Witherow said he stayed with Harrold only a few days in October 2008. At that time, Witherow lived with his new girlfriend in Bradley County. He spent the night away from her only when they argued. When Witherow and the victim were together at Harrold's house, they would sometimes argue. Witherow said it was because the victim was jealous of his attention to other women. He said he argued with the victim a couple of days before her death because she did not go to the liquor store for him.

While living with Harrold, Witherow was employed as a cement worker and had periods without work. The morning before the offense, he and a friend hunted squirrels with a .22 rifle in the Ooltewah area and shared a pint of vodka that afternoon. James O'Donald, whose nickname was "Possum", drove to Harrold's house, and Witherow left with O'Donald to go to a house in Birchwood. Upon their arrival, O'Donald and Witherow drank a case of beer. Witherow slept a couple of hours that night, and the next morning, he drove O'Donald's car back to Harrold's house. Witherow could not remember exactly when they arrived at Harrold's house but thought it was around 8:00 a.m. When asked if he was "doing any drinking when [he] came back," Witherow replied, "I had a quart of beer." He also had consumed a cup of coffee at Harrold's that morning.

Later that morning, Witherow went outside of Harrold's house to receive better cell phone reception and to determine if he had received a telephone call concerning a job. The victim was getting something out of the trunk of her car when Witherow exited the house, and they spoke. Witherow said the victim told him earlier in the week that she would take him to meet someone about a job. However, the victim told him she was taking Baker to a job interview at that time and that Witherow would have to wait until they returned.

Witherow could only remember driving in his car after his conversation with the victim. He explained that his "memory ain't too good." Witherow said he drove to the mental hospital "because everything seemed like it was a dream . . . . I tried to run in and talk to them and see about getting some medicine or something because I was feeling like I was in a dream that whole morning." He did not remember having a gun or shooting anyone on the day of the offense. When asked, "Did you shoot anybody that morning?" Witherow responded, "I don't know." He said the previous evening he took a hydrocodone pill because he had a headache. He said he did not know why he drank a lot and said "I guess to calm me down sometime." Witherow agreed that he had a .22 caliber rifle for squirrel hunting and a .410 caliber shotgun

-9-

for rabbit hunting on the day of the offense, both of which were borrowed. While he had owned a handgun in the past, he said he did not own a handgun on the day of the offense.

On cross-examination, Witherow said he and O'Donald drank Budweiser the night before the offense. He recalled only the nickname of the friend, "Rook", who drank one or two beers with them. He said he hunted squirrels with a .22 rifle alone the night before the offense. He admitted that he was angry with the victim because she wore a wire and acted as an informant for the police, but said he "got over it." He remembered apologizing to Harrold and explained the following:

> [I]t wasn't about - - what I was apologizing to her for, she told me . . . . don't hit no woman up there on the hill at her house. And you know I said . . . . I wouldn't hit nobody. Just said don't hit . . . . because I have a few girlfriends that we just friends, but other people might think something else but. . . . I wasn't going to hit [the victim]. I was just jiving her.

Witherow denied telling others that he was going to retaliate against the victim for snitching on him. Witherow also said "even if . . . I . . . was going to do something like that, I wouldn't [do] it around people no way." He said he "vaguely" remembered the victim's bleeding body lying in the road. He said on his way to the mental hospital, he stopped to get a sandwich and gas. He said he told the director at the mental hospital that he only "thought" he shot his girlfriend. He said he could remember drinking Budweiser the night before the offense because it was his usual type of beer.

*State v. Malcolm Witherow*, No. E2012-00131-CCA-R3-CD, 2013 WL 3353338, at *1-7 (Tenn. Crim. App. June 28, 2013), *no perm. app. filed*.

The Petitioner filed the instant petition for post-conviction relief, alleging he received the ineffective assistance of trial and appellate counsel on multiple grounds, that his conviction was based upon evidence obtained in violation of his protection against unreasonable searches and seizures, and that his rights to a fair trial and due process were violated as a result of perjury from the State's witnesses.

At the post-conviction hearing, appellate counsel testified that he prepared the Petitioner's brief for the appeal of the conviction and that although he recalled Tyler Baker's testifying at the trial, the appellate record did not contain Mr. Baker's pretrial video-recorded police statement. Counsel said that Mr. Baker's statement was not a trial exhibit and that he

did not have the authority to attach Mr. Baker's statement to the trial or appellate court records. Counsel said that he crafted his sufficiency of the evidence argument based upon all of the evidence contained in the court record.

On cross-examination, appellate counsel did not dispute that he supported his insufficient evidence allegation with six sentences of argument. He said that his arguments on appeal were limited by the issues trial counsel raised in the motion for a new trial. Appellate counsel agreed that an offer of proof relative to the contents of Mr. Baker's pretrial statement was not contained in the trial court record, which prevented counsel from utilizing Mr. Baker's statement in the appeal.

Herman Pickleshimer, Jr., testified that he did not attend the trial, although the Petitioner and the victim were his friends. He said that the Petitioner's trial and appellate counsel did not question him, although he was at Connie Harrold's home on the day of the shooting. Mr. Pickleshimer recalled that he was at Ms. Harrold's home working on a transmission when the Petitioner and the victim began arguing and that Mr. Pickleshimer got in his car and left. He said that he lived with his grandmother at the time of the shooting and that the Petitioner began living with him and his grandmother a few days before the shooting. Mr. Pickleshimer recalled that the Petitioner moved into Mr. Pickleshimer's grandmother's home because the Petitioner did not want to argue with the victim and because the victim "push[ed] [the Petitioner] around and stuff."

Mr. Pickleshimer testified that the victim, the Petitioner, Ms. Harrold, and Mr. Baker were at the home when Mr. Pickleshimer arrived. Mr. Pickleshimer recalled that Ms. Harrold was in the basement doing laundry, that the victim was sitting on a living room chair, and that Mr. Baker was asleep. Mr. Pickleshimer said that initially, the Petitioner was also in the living room but that the Petitioner went outside and began pacing on the front porch. Mr. Pickleshimer said that the Petitioner's demeanor was "fine" when Mr. Pickleshimer arrived at the home but that the victim was "angry about something." Mr. Pickleshimer said that the victim yelled at and pushed the Petitioner and that as a result, the Petitioner walked onto the front porch. Mr. Pickleshimer said that the Petitioner's demeanor changed, that the victim continued yelling and pushing the Petitioner, and that Mr. Pickleshimer left the home. Mr. Pickleshimer said he did not hear the Petitioner say that the Petitioner had to "break [his] promise and hurt [the victim]." Mr. Pickleshimer said that he also did not hear the Petitioner tell Mr. Baker that the Petitioner was going to kill the victim.

Mr. Pickleshimer testified that before he entered his car to leave the home, the victim walked into the kitchen and began "fiddling around through the sink drawer." He said that he did not know what was happening but that he wanted to leave because of the "fussing and fighting." He said that as he left in his car, the Petitioner paced on the front porch and that

the victim walked toward the trunk of her car and inserted her key into the trunk's lock. Mr. Pickleshimer did not see the victim open the trunk. Mr. Pickleshimer said that the Petitioner looked "messed up," nervous, and disoriented, and Mr. Pickleshimer recalled that he had never seen the Petitioner in this condition. Mr. Pickleshimer said that the Petitioner was generally calm and was never angry or violent with anyone, including the victim, but that the victim was violent and angry with the Petitioner. Mr. Pickleshimer thought the victim was jealous of the Petitioner. Mr. Pickleshimer believed that the Petitioner "just snapped" because the Petitioner was not himself that day. Mr. Pickleshimer said that the Petitioner's eyes looked "glazed over."

Mr. Pickleshimer testified that as he drove away from Ms. Harrold's home, he heard a "pop" when he reached the bottom of the hill of the driveway but that he never considered the pop could have been gunfire. He said he learned days later from Ms. Harrold that the victim had been shot and recalled Ms. Harrold was not upset with the Petitioner. Mr. Pickleshimer had known the Petitioner twelve to fourteen years and said he did not think the Petitioner was capable of committing premediated murder. Mr. Pickleshimer had known Ms. Harrold all of his life and said that Ms. Harrold expressed concern about testifying in this case again.

On cross-examination, Mr. Pickleshimer testified that although Mr. Baker was inside the home on the day of the shooting, Mr. Baker was asleep in a bedroom and that Mr. Pickleshimer did not see Mr. Baker. Mr. Pickleshimer said that he was inside the home for a short time, that when he entered the home, he said hello to the Petitioner, the victim, and Ms. Harrold, that he used the bathroom and poured a glass of water, and that he went outside to work on his truck's transmission. Mr. Pickleshimer said that on the night before the shooting, he, his grandmother, and the Petitioner were at his grandmother's home.

On redirect examination, Mr. Pickleshimer testified that the Petitioner had stayed at Mr. Pickleshimer's grandmother's home for about three days and that Mr. Pickleshimer never heard the Petitioner express anger toward the victim. Mr. Pickleshimer agreed that at the time of the shooting, the Petitioner's romantic relationship with the victim had ended and that the Petitioner had a new girlfriend. Mr. Pickleshimer said, though, that the Petitioner had expressed fear of the victim because the victim threw objects and became aggressive when angry. Mr. Pickleshimer agreed that the victim was "particularly agitated" on the day of the shooting.

Trial counsel testified that he represented the Petitioner in this case, that he had tried three or four cases before the Petitioner's case, and that the Petitioner's case was counsel's first murder trial. Counsel said that although he did not ask another attorney to assist with the trial, his paralegal, who was a law student at the time, sat with him during the Petitioner's trial. Counsel did not know what medications the Petitioner took at the time of the trial but

said he read the forensic mental health evaluation report, which would have detailed the medications. Counsel recalled discussing the Petitioner's mental health with a counselor, later identified as Dr. Montgomery from Vanderbilt Medical Center, but said he did not recall the details of their conversations. Counsel thought that Dr. Montgomery evaluated the Petitioner based upon counsel's request for an independent mental health evaluation. Counsel noted that the trial court initially denied his request for an independent mental health evaluation but that after counsel filed a motion for reconsideration, the court granted the request. Counsel recalled that the court initially denied the request because the Petitioner's evaluation at "Johnson Mental Health" showed no concerns. Counsel did not recall what, if anything, Dr. Montgomery concluded about the Petitioner's having episodes of blackouts or memory loss. Counsel said that Dr. Montgomery did not testify at the trial and that as a result, counsel assumed Dr. Montgomery's assessment did not provide value to the defense.

Trial counsel testified that Mr. Botts was the defense investigator hired to locate any witnesses and that Mr. Botts had difficulty locating the witnesses. Counsel said that he first spoke to Mr. Baker and Ms. Harrold two days before the trial and that he would have liked additional time to compare their previous statements with his interviews in order to "pull out" their inconsistent statements. Counsel did not request a continuance for this purpose.

Trial counsel testified that he did not recall the frequency with which he met with the Petitioner at the jail but said that it would have been multiple times. Counsel said that although he did not represent the Petitioner at the preliminary hearing, counsel had been present, and he recalled that Ms. Harrold and a police officer testified. Counsel stated that his defense strategy was to attack the sufficiency of the State's evidence identifying the Petitioner as the perpetrator and to argue the shooting was not premeditated. Counsel said that he also focused on the victim's actions outside the home before the shooting, noting no witnesses saw what occurred just before the shooting, and on whether the gun came from the victim. Counsel conceded, though, that no evidence showed that the Petitioner acted in self-defense. Counsel also agreed that identity of the shooter was not disputed but said that the Petitioner's chasing the victim down the driveway of Ms. Harrold's home did not mean the Petitioner shot the victim. Counsel said that although the Petitioner could not remember the events and no other evidence supported counsel's theory, counsel attempted to elicit from witnesses that they did not see the Petitioner shoot the victim.

Trial counsel testified that he and the Petitioner did not discuss the Petitioner's previously having been shot five times during a robbery. Counsel also did not recall discussing this incident with Dr. Montgomery. Counsel believed he addressed the Petitioner's actions resulting from "self-defense, provocation, [and] heat of passion" by cross-examining the State's witnesses about not seeing what occurred outside Ms. Harrold's home just before the shooting. Counsel agreed that if the transcript did not reflect he questioned the witnesses about the Petitioner's demeanor and behavior, the transcript was

accurate. Counsel did not recall any discrepancy between the testimony of the police officers, Ms. Harrold, and Mr. Baker about the time the shooting occurred and the time the 9-1-1 call was placed but noted that any discrepancy was "significant." Counsel did not recall whether he questioned Dr. King about the victim's toxicology report. Counsel recalled the toxicology report showed the presence of drugs.

Trial counsel testified that he did not attempt to introduce evidence of the victim's, Ms. Harrold's, or Mr. Baker's criminal histories and that he did not request fingerprint analysis of the cartridge casings recovered from the scene. Counsel did not recall questioning Mr. Baker and Ms. Harrold about their statements in the 9-1-1 call or their initial police statements in order to show neither witness referenced the Petitioner's alleged previous statement that he would "shoot the victim and then go to the crazy hospital basically so he would get away with it." Counsel recalled that he "fought" with the trial court about introducing Ms. Harrold's and Mr. Baker's video-recorded police statements.

Trial counsel testified that although he was permitted to cross-examine Detective Ashburn about Mr. Baker's police statement, counsel could not question Mr. Baker about the statement because Mr. Baker had been released by the trial court. Counsel said that the video-recorded interviews of Mr. Baker and Ms. Harrold were not transcribed and that counsel believed any transcript of the recordings would have been inadmissible because "they wouldn't have been signed off or verified by the actual witness at the time." Counsel said that he requested permission to recall Ms. Harrold to question her about her police statement but that the judge denied his request. Counsel said that the police located Mr. Baker "maybe two days" after Mr. Baker's initial testimony but that counsel did not request a continuance to provide Mr. Baker time to return for further testimony.

Trial counsel testified that he met the Petitioner's girlfriend's parents before the trial but did not call them as character witnesses relative to the Petitioner's interaction and demeanor with their daughter. Counsel thought he argued at the trial that the Petitioner was too intoxicated to engage in premeditation but agreed, after reviewing the transcript of his closing argument, that he did not argue Ms. Harrold and Mr. Baker did not see the initial confrontation between the victim and the Petitioner. He recalled that a voluntary intoxication instruction was provided to the jury. He said it was difficult to argue simultaneously that insufficient evidence existed, that the Petitioner was not the shooter, and that the Petitioner was incapable of premeditation based upon his intoxication. Counsel said that he tried "do to whatever [he] could" for the Petitioner when asked if his defense was that someone other than the Petitioner shot the victim. Counsel agreed that Mr. Baker initially told the police that the Petitioner was intoxicated when the Petitioner arrived at Ms. Harrold's home but testified inconsistently with this statement at the trial.

Trial counsel testified that he learned the video-recorded police statements of Mr. Baker and Ms. Harrold were not included in the appellate record, that the trial judge would

not allow counsel to "do anything with Ms. Harrold's statement," that counsel did not recall making an offer of proof relative to Ms. Harrold's statement, and that counsel thought Mr. Baker's statement was introduced during Detective Ashburn's testimony. Counsel said he assumed Mr. Baker's statement was included in the appellate record.

Trial counsel testified that he had discussions about the Petitioner's education level, that counsel recalled the "particular circumstances" leading to the Petitioner's lack of education, and that the Petitioner owned a business before going to prison. Counsel said the Petitioner appeared to have clear, coherent conversations. Counsel did not recall whether the Petitioner could read and write. Counsel did not recall discussing that the Petitioner believed Mr. Baker committed perjury during the trial. Counsel did not recall the dosage or the medications the Petitioner took at the time of the trial. Counsel said, though, that the Petitioner never appeared "drugged up" or sleepy as a result of any medication.

Trial counsel testified that during the Petitioner's testimony, counsel questioned the Petitioner about not remembering the shooting. Counsel said, though, the defense did not present an expert witness to discuss the impact of trauma on memory. Counsel agreed the State argued that the Petitioner "faked" his memory loss and said he interviewed the mental health facility staff who treated the Petitioner at the time of the shooting. He agreed the Petitioner's mental health was an issue at the trial and said he did not "know what else to do necessarily under the circumstances other than what I'd already done to . . . develop evidence that could be helpful." He thought he spoke to another attorney, who provided counsel with Dr. Montgomery's contact information. Counsel agreed he did not present evidence substantiating the legitimacy of the Petitioner's memory loss. Counsel did not recall the Petitioner's telling counsel that the Petitioner's prescribed amount of Thorazine caused difficulty staying awake during the trial. Counsel agreed he did not "discover" or contact Mr. Pickleshimer, whose nickname was "Ruke." Counsel said that he thought Mr. Pickleshimer was someone referred to as "Possum" during the trial but conceded that Possum and Ruke were different people. Counsel said that he did not recall Possum's legal name mentioned during the trial, that counsel and the Petitioner discussed the necessity of learning Possum's legal name in order to present him as a trial witness, that counsel asked Mr. Baker and Ms. Harrold for Possum's legal name, and that counsel did not recall either of them providing it.

On cross-examination, trial counsel testified that he cross-examined Mr. Baker extensively about the Petitioner's drinking alcohol, the Petitioner's and the victim's previous arguments, and the Petitioner's ability to "control himself generally around the victim." Counsel said that he attempted to show that the shooting could not have been premeditated and that the Petitioner would have had multiple opportunities to harm the victim but chose not to hurt her. Counsel said that he questioned Mr. Baker about whether he had seen the Petitioner with a firearm and that the Petitioner had been squirrel hunting with a .22-caliber

-15-

rifle the day before the shooting. Counsel agreed Mr. Baker admitted that the Petitioner was in a relationship with another woman at the time of the shooting and that the Petitioner's general mood had improved before the shooting. Counsel recalled that when the Petitioner went to "prison" for the drug-related "conviction," the Petitioner lost his personal belongings and had difficulty adjusting to life outside of prison.

Trial counsel testified that he requested permission to cross-examine Mr. Baker about his video-recorded police statement for impeachment purposes and as substantive evidence. Counsel said that the trial court denied his request to introduce Mr. Baker's statement as substantive evidence on three occasions. Counsel said that the trial court recessed and that after a jury-out discussion, the court allowed counsel to question Mr. Baker further to determine whether Mr. Baker's trial testimony was inconsistent with his police statement and that ultimately, the court allowed counsel to "use only a limited written statement" to impeach Mr. Baker. Counsel admitted that he became frustrated with the trial judge and said that after his cross-examination, he presented the court with case law supporting his argument that he should be permitted to use Mr. Baker's recorded statement during cross-examination. Counsel said that the court revised its previous ruling and allowed him to introduce portions of Mr. Baker's recorded statement for impeachment purposes but that by this time, Mr. Baker was no longer available. Counsel said that as a result, the court allowed him to introduce portions of Mr. Baker's recorded statement through Detective Ashburn for impeachment purposes and that counsel provided the trial court with the portions of the recording he wanted to introduce. Counsel agreed that the relevant portions of Mr. Baker's recorded statement related to how long the Petitioner had lived at Ms. Harrold's home, whether the Petitioner made threatening statements toward the victim, whether Mr. Baker was surprised by the shooting, the Petitioner's relationship with a woman who lived in Georgia, whether the Petitioner was intoxicated or sober when he made any threats toward the victim, and whether Mr. Baker reported to the police that the Petitioner and Possum had been together the night before the shooting.

Trial counsel testified that the Petitioner underwent his first mental health examination in March 2009 and that an "insanity defense" was not supported by the evaluation. Counsel said that the report led him to contact Dr. Montgomery, that counsel requested Dr. Montgomery independently examine the Petitioner, and that the trial court initially denied his request but later granted it after reconsideration in January 2011. Counsel agreed that if the evaluation were not favorable to the defense, he would not have filed a copy of it with the trial court.

Trial counsel testified that the only people the Petitioner stated were at Ms. Harrold's home at the time of the shooting were Ms. Harrold, Mr. Baker, the victim, and Possum. Counsel did not recall the Petitioner's testifying that Ruke was with him and Possum the night before the shooting. Counsel said that he and the Petitioner discussed Possum several

times before the trial but that counsel did not recall any mention of Ruke. Counsel said that during closing argument, he discussed the testimony relative to the Petitioner's intoxication and the amount of alcohol the Petitioner had consumed the night before and the morning of the shooting. Counsel thought the main portion of his closing argument focused on the Petitioner's intoxication and that the other portion focused on Mr. Baker's and Ms. Harrold's not witnessing the shooting. Relative to premeditation, counsel recalled arguing that the Petitioner did not plan to shoot the victim, that the Petitioner had been drinking all of the previous night, and that "things just happened." Counsel did not recall whether he stated during his closing argument that the Petitioner was too intoxicated to have been capable of premeditation.

On redirect examination, trial counsel testified that he attempted to question Mr. Baker and Ms. Harold about whether they ever saw the victim with a firearm but that it was difficult to argue the victim brandished a firearm first because Mr. Baker and Ms. Harrold did not witness the shooting. Counsel agreed the Petitioner stated that the Petitioner and the victim had resolved their differences related to the victim's role in sending him to jail and that the Petitioner allowed the victim to stay with him when the victim had nowhere else to go. Counsel recalled discussing with Dr. Montgomery whether the Petitioner had suffered some type of diminished capacity but did not recall Dr. Montgomery's conclusions.

The post-conviction court denied relief. Relative to the Petitioner's allegations that trial counsel failed to impeach Mr. Baker with Mr. Baker's video-recorded police statement and that counsel should have made an offer of proof showing the contents of Mr. Baker's recorded statement, the court determined that counsel did not provide deficient performance. The court found that the trial court initially denied counsel's requests to use Mr. Baker's recorded statement as substantive evidence, to refresh Mr. Baker's recollection, and for impeachment purposes. The post-conviction court found that counsel persisted in his request and that the trial court conceded it erred by denying counsel permission to use the recorded statement for impeachment purposes. The post-conviction court found that by the time the trial court reversed its previous ruling relative to impeachment, Mr. Baker's testimony had concluded and that Mr. Baker had been released by the trial court. As a result, the post-conviction court determined that counsel's inability to cross-examine Mr. Baker about his recorded statement to the police was not the result of deficient performance, but rather the result of the trial court's initial ruling.

The post-conviction court also determined that trial counsel did not provide deficient performance because he failed to request a continuance to provide Mr. Baker time to return for further testimony. The post-conviction court found that the trial court told the jury that it made a mistake and that it would allow counsel to admit Mr. Baker's recorded statement through Detective Ashburn's testimony because Mr. Baker spoke to the detective. The post-conviction court found that the trial court provided counsel with the choice between recalling

Mr. Baker and admitting the recorded statement through the detective's testimony. The post-conviction court determined that counsel chose to present the recorded statement through the detective's testimony and that the court would not question counsel's strategic decision made during the trial. The post-conviction court determined that counsel's choice was reasonable based upon the "unique circumstances." The post-conviction court also determined that the Petitioner failed to establish that the outcome of the trial would have been different had the recorded statement been admitted during Mr. Baker's testimony, rather than Detective Ashburn's testimony.

The post-conviction court determined relative to counsel's failure to make an offer of proof of Mr. Baker's video-recorded police statement in its entirety, portions of which were played for the jury, that counsel did not provide deficient performance. The post-conviction court determined that the trial transcript reflected that the relevant portions played for the jury included Mr. Baker's statements regarding how long Mr. Baker had lived at Ms. Harrold's home, how long the Petitioner had been staying at Ms. Harrold's home, whether the Petitioner "got drunk" and talked about killing the victim before the shooting, that the Petitioner arrived at Ms. Harrold's home at 7:00 a.m. on the morning of the shooting with Possum, that the Petitioner went to Georgia to spend time with someone two nights before the shooting, that the Petitioner did not threaten anyone when he was sober, and that the Petitioner's threats toward the victim occurred only when the Petitioner was intoxicated. The post-conviction court determined that the jury heard the relevant portions of Mr. Baker's statement, that counsel questioned the detective about Mr. Baker's responses, and that the trial court instructed the jury that it could consider Mr. Baker's responses in considering his credibility. The post-conviction court found that the portions played for the jury were detailed in the trial transcript and determined that counsel had made an offer of proof relative to the portions of the recordings counsel believed showed Mr. Baker's inconsistent statements. The post-conviction court determined that the Petitioner did not present any additional evidence from the recording in an effort to show counsel provided deficient performance in his selections and that the Petitioner failed to establish prejudice in this regard.

The post-conviction court determined that trial counsel did not provide deficient performance relative to the Petitioner's mental health evaluation. The court found that an independent mental health examination was performed and that the results of the evaluation did not support a viable defense. The court found that counsel successfully obtained funds for the evaluation performed by Dr. Montgomery and that the trial court record reflected that counsel requested payment for Dr. Montgomery's services. The post-conviction court found that although counsel did not recall at the post-conviction hearing whether the evaluation was performed and what the results would have been, the evidence established by a preponderance of the evidence that an evaluation was conducted. The court credited counsel's testimony that he would have presented at the trial any favorable conclusions from

-18-

the evaluation. The court determined that the Petitioner failed to establish prejudice because he failed to present Dr. Montgomery at the post-conviction hearing to establish whether Dr. Montgomery's conclusions were favorable to the defense. The court noted the Petitioner did not testify at the post-conviction hearing and found that the Petitioner failed to show that he suffered from any mental health disorder.

The post-conviction court determined that trial counsel did not provide deficient performance by failing to present Mr. Pickleshimer as a trial witness to establish the Petitioner did not engage in premeditation. The court found that it was "unclear" how counsel could have reasonably known about Mr. Pickleshimer. The court found that counsel asked witnesses for the names of the people present at Ms. Harrold's home on the morning of the shooting. The court credited counsel's testimony that he spoke with Ms. Harrold and Mr. Baker a couple of days before the trial and that counsel was not told Mr. Pickleshimer was at the home. The court also credited counsel's testimony that the Petitioner never identified Mr. Pickleshimer as someone who was at the home before the shooting occurred. The court found that although counsel said he could have learned of Mr. Pickleshimer if counsel had additional time to speak with Ms. Harrold and Mr. Baker, counsel's statement was "pure speculation . . . [and] conjecture." The court found that Ms. Harrold, Mr. Baker, and the Petitioner did not mention Mr. Pickleshimer's presence before the shooting during the trial. The post-conviction court further determined that post-conviction counsel's ability to identify and locate Mr. Pickleshimer was not determinative. The court found that counsel investigated the facts of the case and the possible witnesses by interviewing the Petitioner, Ms. Harrold, and Mr. Baker before the trial. The court found that the Petitioner's single trial reference to Ruke relative to the events the night before the shooting was not "sufficient to alert" counsel that Ruke could have been at the home on the morning of the shooting.

The post-conviction court determined that trial and appellate counsel did not provide ineffective assistance by failing to ensure Mr. Baker's video-recorded police statement was included in the record to facilitate appellate review. The court noted that the issues relevant to the recording were whether it could have been used for impeachment purposes and whether it could have been used for substantive evidence. The post-conviction court noted that although the recording was not included in the appellate record, this court "had no impediment to analyzing the effect of Mr. Baker's recorded statement" on the sufficiency of the convicting evidence. The post-conviction court also noted that this court determined on appeal that "[a]ny error by the trial court in failing to admit Baker's video statement as substantive evidence had no bearing on the aforementioned proof." Although the post-conviction court did not determine whether trial or appellate counsel provided deficient performance, the court determined that, based upon the appellate court's conclusions in the appeal of the Petitioner's conviction, the Petitioner failed to established he was prejudiced by the failure to the include the recording in the appellate record.

-19-

The post-conviction court determined that appellate counsel did not provide ineffective assistance by failing to prepare an adequate legal argument with citations to the record on appeal relative to the sufficiency of the evidence. The post-conviction court noted that although appellate counsel argued that the jury would have reached a different conclusion about premeditation if it could have considered Mr. Baker's statement to the police, appellate counsel failed to identify any of Mr. Baker's relevant statements. The post-conviction court determined that, based upon the appellate court's opinion, the Petitioner failed to establish that he was prejudiced by appellate counsel's performance. The post-conviction court noted that this court "was able to determine the substance of these statements from citations provided elsewhere in the brief" and that this court reviewed the sufficiency of the evidence, including the excerpts of the recording presented at the trial during the detective's testimony. This appeal followed.

The Petitioner contends that he received the ineffective assistance of trial and appellate counsel. He argues that trial counsel failed to present Mr. Pickleshimer at the trial whose testimony was relevant to the Petitioner's state of mind at the time of the shooting, the Petitioner's reputation for peacefulness, and whether the Petitioner acted pursuant to adequate provocation. The Petitioner also argues that trial counsel failed to cross-examine Mr. Baker properly and failed to make an offer of proof of Mr. Baker's video-recorded police statement. Likewise, the Petitioner alleges trial counsel failed to present the psychological defenses of diminished capacity and "severe" intoxication and failed to ensure the Petitioner stopped taking his psychological medication in order for the Petitioner to participate meaningfully in the trial. The Petitioner argues that appellate counsel failed to provide an adequate argument in the appellate brief supporting the sufficiency of the evidence allegation. The State responds that "the Petitioner failed to show that he was prejudiced by his attorney's ineffective assistance at trial."

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## A. Trial Counsel

### 1. Mr. Pickleshimer

The Petitioner argues that trial counsel failed to present Mr. Pickleshimer at the trial whose testimony was relevant to the Petitioner's state of mind at the time of the shooting, the Petitioner's reputation for peacefulness, and whether the Petitioner acted with adequate provocation.

The record reflects that Mr. Pickleshimer was present at Ms. Harrold's home on the morning of the shooting but that neither trial counsel nor the defense investigator identified Mr. Pickleshimer as a potential trial witness or attempted to locate Mr. Pickleshimer. Mr. Pickleshimer testified that he was at Ms. Harrold's home working on his truck's transmission before the shooting occurred and that he "noticed" the Petitioner and the victim fighting outside the home. Mr. Pickleshimer stated that initially, the Petitioner's demeanor was "fine" but that the victim was "angry about something" and pushed the Petitioner. Mr.

Pickleshimer saw the Petitioner's demeanor change after the victim pushed the Petitioner, and Mr. Pickleshimer got in his car to leave after watching the victim's continuing to push and yell at the Petitioner. Mr. Pickleshimer said that the Petitioner looked "messed up," nervous, and disoriented and that Mr. Pickleshimer had never seen the Petitioner in this condition. Although Mr. Pickleshimer did not witness the shooting, he did not believe the Petitioner was capable of premeditation and believed that the Petitioner "snapped." Mr. Pickleshimer had never witnessed the Petitioner be violent.

Mr. Pickleshimer's testimony would have been relevant to the Petitioner's state of mind at the time of the shooting and his lack of violent conduct. However, trial counsel's credited testimony reflects that the Petitioner never told counsel that Mr. Pickleshimer was at the home on the morning of the shooting. Counsel stated that the only people the Petitioner identified at Ms. Harrold's home were Ms. Harrold, Mr. Baker, the victim, and Possum. In any event, counsel investigated the case by reviewing the discovery materials provided by the prosecution, utilized the services of an investigator, and interviewed Ms. Harrold and Mr. Baker before the trial. Neither the discovery materials nor the State's witnesses mentioned to counsel that Mr. Pickleshimer was present at Ms. Harrold's home on the morning of the shooting. Although the Petitioner mentioned "Ruke," Mr. Pickleshimer's nickname, during his cross-examination at the trial in the context of squirrel hunting and drinking beer with the Petitioner and Possum on the day before the shooting, the trial transcript does not reflect that any witness, including the Petitioner, mentioned Mr. Pickleshimer in any context relative to the day of the shooting. As a result, the record supports the post-conviction court's determination that counsel did not provide deficient performance in this regard.

Furthermore, the Petitioner has failed to establish any prejudice. Although Mr. Pickleshimer's testimony could have been relevant to the Petitioner's state of mind, Mr. Pickleshimer did not witness the shooting. Rather, his testimony reflects that he left Ms. Harrold's home before the shooting began and did not know the victim had been shot until days afterward. Although Mr. Pickleshimer saw the victim yell and push the Petitioner and thought the Petitioner might have snapped, nothing in the record suggests that the victim's conduct resulted in the Petitioner's acting under adequate provocation to shoot the victim multiple times. Mr. Pickleshimer did not see the victim open the trunk of her car and did not see the victim display a weapon of any type. The post-conviction court did not err by denying relief.

We note that portions of Mr. Pickleshimer's post-conviction testimony conflicted with the Petitioner's trial testimony. Mr. Pickleshimer testified that the Petitioner began living with him and his grandmother a few days before the shooting. However, the Petitioner testified at the trial that he lived with his "new girlfriend in Bradley County." Furthermore, Mr. Pickleshimer's testimony that the Petitioner was at Mr. Pickleshimer's grandmother's house on the night before the shooting does not support the Petitioner's trial testimony. The

-22-

Petitioner testified that on the morning before the shooting, the Petitioner and Possum, identified as James O'Donald, went squirrel hunting and drank vodka. The Petitioner stated that on the night before the shooting, he and Possum "went up to some other people's house up in Birchwood and we [were] drinking beer." The Petitioner stated that Possum picked him up from Ms. Harrold's home that evening, that Possum drove to the home in Birchwood, and that they, along with another friend later identified as Ruke, drank one case of beer. The Petitioner said that he returned to Ms. Harrold's home the morning of the shooting. The Petitioner did not testify that he spent the night before the shooting at Mr. Pickleshimer's grandmother's home. The Petitioner is not entitled to relief on this basis.

## 2.     Cross-examination of Mr. Baker

Relative to trial counsel's cross-examination of Mr. Baker, the Petitioner recites counsel's post-conviction hearing testimony in the argument section of the brief but fails to present any legal argument supporting his ineffective assistance allegation. The issue as written in the Petitioner's brief states, "[T]rial counsel failed, based on his lack of criminal defense experience, . . . to properly cross-examine Tyler Baker, the State's chief witness." In the argument section of the appellate brief, the Petitioner notes that counsel mistakenly thought he had cross-examined Mr. Baker and Ms. Harrold about the Petitioner's "demeanor and him snapping or being provoked and impassioned by the victim's behavior." The Petitioner likewise noted that counsel "admitted that the witnesses testified the shooting occurred around 7:00 or 8:00 a.m., but the detectives testified they were not dispatched until 10:00 a.m." and that counsel did not "pick[] up on this." The Petitioner states in his brief that counsel "did not bring out the fact that the victim had drugs in her system" or that the State's witnesses had criminal histories. Finally, the Petitioner notes that counsel agreed that none of the prosecution's witnesses stated in the 9-1-1 call or in their initial police statements that the Petitioner said "he was going to a crazy hospital to help his case." We presume that these are the questions the Petitioner alleges trial counsel should have asked during the trial and that because counsel did not ask these questions, he provided ineffective assistance.

Because the Petitioner's allegation is based upon trial counsel's cross-examination of Mr. Baker, our analysis is limited to whether counsel provided ineffective assistance during his cross-examination of Mr. Baker. Mr. Baker testified that he did not witness the shooting and that he did not observe anything unusual about the Petitioner before the shooting occurred. Mr. Baker testified that after the shooting, the Petitioner was "[j]ust real calm about it" and did not respond when Mr. Baker asked what occurred. Mr. Baker stated that he had previously seen the victim and the Petitioner have verbal altercations but never physical altercations before the shooting. As a result, Mr. Baker, based upon his trial testimony, would not have been able to provide information relative to whether the Petitioner acted within a state of adequate provocation or passion. Furthermore, the Petitioner did not present Mr. Baker at the post-conviction hearing, and this court will not speculate about what Mr.

Baker's testimony would have been in this regard. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The record supports the post-conviction court's general determinations that the Petitioner has failed to show that trial counsel provided deficient performance or that the Petitioner was prejudiced by counsel's performance. The post-conviction court did not err by denying relief, and the Petitioner is not entitled to relief on this basis.

Relative to the timeline on the morning of the shooting, Mr. Baker testified that the Petitioner arrived at Ms. Harrold's home around 7:00 or 7:15 a.m., that Ms. Harrold's son left the home around 8:30 or 9:00 a.m., and that Mr. Baker asked the victim about her driving him to a job interview around 10:00 a.m. We note that Ms. Harrold did not dispute during cross-examination that the Petitioner arrived at her home around 7:00 a.m. and that the 9-1-1 call was made around 10:00 a.m. Therefore, nothing in the record reflects that the timeline of events was disputed, and no evidence presented at the post-conviction hearing reflects otherwise. The post-conviction court did not err by denying relief, and the Petitioner is not entitled to relief on this basis.

Relative to the victim's having drugs in her system at the time of the shooting, the record does not indicate Mr. Baker was questioned at the trial about the victim's alleged drug use, but the record does reflect that Ms. Harrold admitted at the trial that she and the victim smoked marijuana occasionally and that they "could have" smoked marijuana on the morning of the shooting. Although counsel recalled that the victim's toxicology report may have showed the presence of drugs, the Petitioner did not present any evidence, including the toxicology report or expert testimony, at the post-conviction hearing to establish whether the victim had recently used any controlled substances and, if so, the effect of any relevant controlled substance. This court will not speculate about the results of the victim's toxicology report. Furthermore, the Petitioner did not present Mr. Baker at the post-conviction to establish whether Mr. Baker had any knowledge of the victim's alleged drug use, and this court will likewise not speculate about what Mr. Baker would have said in this regard. *See Black*, 794 S.W.2d at 757. The record supports the post-conviction court's general determinations that the Petitioner has failed to show that trial counsel provided deficient performance or that the Petitioner was prejudiced by counsel's performance. The post-conviction court did not err by denying relief, and the Petitioner is not entitled to relief on this basis.

Relative to the counsel's failure to present evidence of Mr. Baker's criminal history, no evidence presented at the post-conviction hearing reflects Mr. Baker had any criminal convictions. The Petitioner did not present certified copies reflecting Mr. Baker had any criminal convictions or present Mr. Baker as a witness to testify about any conviction he may have had at the time of the offense or the trial. *See Black*, 794 S.W.2d at 757. The record supports the post-conviction court's general determinations that the Petitioner has failed to

show that trial counsel provided deficient performance or that the Petitioner was prejudiced by counsel's performance. The post-conviction court did not err by denying relief, and the Petitioner is not entitled to relief on this basis.

Relative to the 9-1-1 recording reflecting that nobody said the Petitioner stated that "he was going to a crazy hospital to help his case" after the shooting, we note that the recording is neither included in the appellate record nor transcribed in the trial transcript. However, this court summarized in the appeal of the conviction that during the 9-1-1 call, Ms. Harrold stated that the Petitioner shot the victim with a "small pistol" and left the scene and that the victim "wore a wire on him several years back" when the 9-1-1 operator asked why the Petitioner would have been angry with the victim. *Malcolm Witherow*, 2013 WL 3353338, at *1. The trial transcript reflects that Ms. Harrold told Mr. Baker to call 9-1-1, that Ms. Harrold spoke to the operator, and that Ms. Harrold "believed" she was "out of [her] mind" and "incoherent" when she spoke to the operator. Ms. Harrold did not testify at the trial that the Petitioner said he was going to mental health facility. Rather, Ms. Harrold testified that the Petitioner did not say anything to her after the shooting.

Tyler Baker testified at the trial that Ms. Harrold told him to call 9-1-1 after the shooting and that he gave the telephone to Ms. Harrold. *Malcolm Witherow*, 2013 WL 3353338, at *2. Therefore, the record does not reflect that Mr. Baker provided the 9-1-1 operator with any substantive information about the shooting. However, at the trial, Mr. Baker testified that, at an unidentified time, the Petitioner previously stated that he was going to kill the victim and that he would "get away with it" by going to the "crazy house." *Id*. Mr. Baker did not testify that the Petitioner referenced seeking treatment at a mental health facility at the time of the shooting. Rather, Mr. Baker testified that the Petitioner was calm and did not speak after the shooting. The record does not reflect that trial counsel questioned Mr. Baker about his reference to the mental health facility during Mr. Baker's direct examination. Furthermore, Mr. Baker's video-recorded police statement was not presented at the post-conviction hearing and is not included in the appellate record. However, the trial transcript reflects that the single relevant excerpt from the recording was largely inaudible and that Mr. Baker told Detective Ashburn the following:

> [the Petitioner] (Inaudible), I mean he's always like saying I'm going to kill that b----, this and that. But I mean you know (Inaudible) after that and then you know he's say I (Inaudible) almost a week and half but I won't go to jail because I (inaudible) about it. I mean –[.]

This excerpt was played in the context of counsel's attempting to show that the Petitioner became intoxicated about one and one-half weeks before the shooting and talked about killing the victim while under the influence of alcohol. Detective Ashburn testified that Mr. Baker stated that the Petitioner talked about killing the victim after becoming intoxicated one and one-half weeks before the shooting. The record does not reflect that Mr. Baker

-25-

referenced any clear comment about the Petitioner's seeking mental health treatment in an effort to avoid criminal punishment.

Contrary to the Petitioner's allegation that trial counsel failed to highlight that Mr. Baker did not mention the Petitioner's previous comment about avoiding criminal responsibly during the 9-1-1 call, the record establishes that Mr. Baker mentioned the largely inaudible comment during his initial police statement before testifying at the trial. We note that Detective Ashburn also testified that Mr. Baker previously stated that the Petitioner only threatened the victim when the Petitioner was intoxicated and that the Petitioner never "messed with anyone" when the Petitioner was sober. The corresponding excerpt from the video recording was played for the jury in which Mr. Baker stated, "[The Petitioner] was never mad at [the victim] when he was sober. He just really didn't talk to nobody that much." The Petitioner has failed to establish that counsel provided deficient performance in this regard or that the Petitioner was prejudiced by counsel's performance. Counsel's strategy was to show the Petitioner's intoxication played some role in the killing, and Mr. Baker's recorded statement to the detective reflected that Mr. Baker said the Petitioner was intoxicated when the Petitioner discussed killing the victim. The record supports the post-conviction court's general determinations that the Petitioner has failed to show that trial counsel provided deficient performance or that the Petitioner was prejudiced by counsel's performance. The post-conviction court did not err by denying relief, and the Petitioner is not entitled to relief on this basis.

### 3.     Offer of Proof of Mr. Baker's Video-Recorded Police Statement

The Petitioner argues that trial counsel failed to make an offer of proof relative to Mr. Baker's video-recorded police statement. The record reflects that trial counsel sought to introduce Mr. Baker's video-recorded statement as substantive evidence and for impeachment purposes. The trial court denied counsel's request for both purposes but later reversed its ruling relative to impeachment. However, by the time the trial court corrected its erroneous ruling, Mr. Baker had finished his testimony and had been released by the court. Although the court permitted trial counsel to recall Mr. Baker, he was more than six hours away and was not readily available to testify. As a result, trial counsel was permitted to present selected portions of the recorded statement through Detective Ashburn's testimony because Mr. Baker provided the statement to the detective. No objections to this procedure appear in the record. The trial court instructed the jury that it had erred by not permitting counsel to cross-examine Mr. Baker with the previous statement to show Mr. Baker's prior inconsistent statements and that the only mechanism to admit excerpts from the recording was through Detective Ashburn's testimony. The court instructed the jury that the recording was to be used for determining Mr. Baker's credibility, and no objections to the court's instruction appear in the record. Trial counsel identified the portions of the video recording he wished to present to the jury, and the excerpts were played for the jury during Detective

Ashburn's testimony. The record reflects that the recording was not admitted into evidence and that counsel did not make an offer of proof of the entire recording.

The allegation in the appellate brief is that the Petitioner received the ineffective assistance of counsel because trial counsel "failed, based on his lack of criminal defense experience, . . . to make an offer of proof, along with appellate counsel, with regard to Baker's prior recorded statement to law enforcement which was strongly inconsistent with his trial testimony." The argument section of the Petitioner's brief relevant to an offer of proof states the following:

> [Trial counsel] also agreed that he did not ask to halt the trial for a brief period in order to have Tyler Baker returned once [the trial judge] agreed that her prior ruling had been in error prohibiting [counsel] from cross-examining [Mr.] Baker by impeaching him with a copy of a prior recorded statement he made despite the fact that [counsel] felt such was crucial to effectively cross-examining the State's main witness with a prior inconsistent statement. [Counsel] also agreed that he had not utilized [the Petitioner's] new girlfriend's family as character witnesses and that they would have stated he had a very gentle demeanor.

The Petitioner has failed to present any legal argument and to identify relevant portions of the record showing that trial counsel provided deficient performance relative to his failure to make an offer of proof of Mr. Baker's video-recorded police statement. Although counsel was initially not permitted to cross-examine Mr. Baker about the previous inconsistent statements, counsel was permitted to present Mr. Baker's inconsistent statements to the jury. The Petitioner has not alleged he received ineffective assistance because counsel's failure to make an offer of proof of the entire recorded statement prevented appellate counsel from arguing on appeal that the trial court erred by not admitting Mr. Baker's statement as substantive evidence. Furthermore, the Petitioner has not identified any inconsistent statement not presented by trial counsel during Detective Ashburn's testimony. The video-recorded statement was not presented at the post-conviction hearing, and this court will not speculate whether any additional inconsistencies existed between the recording and Mr. Baker's trial testimony. *See Black*, 794 S.W.2d at 757. The record supports the post-conviction court's determinations that the Petitioner has failed to show that trial counsel provided deficient performance or that the Petitioner was prejudiced by counsel's performance. The Petitioner is not entitled to relief on this basis.

To the extent that the Petitioner argues appellate counsel should have made an offer of proof of Mr. Baker's video-recorded statement, no legal authority exists allowing appellate counsel to create evidence for appellate review that was not admitted in the trial court proceedings. Likewise, it was impossible for appellate counsel to supplement the appellate

-27-

record with evidence not admitted in the trial court proceedings. The record supports the post-conviction court's general determinations that the Petitioner has failed to show that appellate counsel provided deficient performance or that the Petitioner was prejudiced by counsel's performance. This allegation is without merit, and the Petitioner is not entitled to relief.

Although not relevant to trial counsel's failure to make an offer of proof of Mr. Baker's police statement, we note the Petitioner's single reference to counsel's failure to present the Petitioner's girlfriend's parents as character witnesses at the trial. The Petitioner failed to present the potential witnesses as the post-conviction hearing, and we will not speculate what their testimony would have entailed. *See Black*, 794 S.W.2d at 757. The record supports the post-conviction court's general determinations that the Petitioner has failed to show that trial counsel provided deficient performance or that the Petitioner was prejudiced by counsel's performance. The post-conviction court did not err by denying relief, and the Petitioner is not entitled to relief on this basis.

## 4.    Psychological Defenses

The Petitioner alleges that trial counsel provided ineffective assistance by "failing to present a psychological defense in terms of diminished capacity and severe intoxication" and by failing "to have the Petitioner stop taking his Thorazine a few days before trial so that he could meaningfully participate in his trial." The argument portion of the brief relevant to the Petitioner's mental health states that trial counsel did not recall the Petitioner's medication but that counsel recalled the Petitioner underwent mental health evaluations and could have been prescribed Thorazine. The Petitioner notes that counsel did not recall the Petitioner's telling counsel he could not stay awake at the trial because of his medication and that counsel did not ask the Petitioner to stop taking his medication a few days before the trial. The Petitioner states that although counsel recalled an independent psychological evaluation was performed, counsel did not recall what the evaluation showed about the Petitioner's medication or memory loss or blackout periods from past trauma associated with the Petitioner's being shot five times during a robbery. The Petitioner noted that counsel could not recall what discussions he had with Dr. Montgomery, who conducted the evaluation.

The record reflects that the trial court approved payment for Dr. Montgomery to evaluate the Petitioner's mental health. However, Dr. Montgomery's report was not filed with the trial court, provided to the prosecution, or mentioned during the trial. Trial counsel's credited testimony reflects that if the report were not favorable to the defense, he would not have presented it in the trial proceedings. The Petitioner did not present Dr. Montgomery or his evaluation report at the post-conviction hearing, and this court will not speculate about Dr. Montgomery's conclusions relative to the Petitioner's mental health or prescribed medications. *See Black*, 794 S.W.2d at 757. No evidence was presented at the

post-conviction hearing that the evaluation supported any form of diminished capacity, and although counsel did not recall Dr. Montgomery's conclusions, counsel said that he and Dr. Montgomery discussed whether the Petitioner suffered some form of diminished capacity. Relative to the Petitioner's medication, no evidence was presented at the post-conviction hearing about the Petitioner's medications or any adverse effects of the prescribed medications. This court will not speculate relative to the Petitioner's prescribed medications or any effects. Likewise, the trial transcript does not reflect any concern about the Petitioner's appearance or demeanor during the trial. The Petitioner did not testify at the post-conviction hearing, and counsel's uncontradicted testimony does not reflect that Petitioner was impaired during the trial. The record supports the post-conviction court's general determinations that the Petitioner has failed to show that trial counsel provided deficient performance or that the Petitioner was prejudiced by counsel's performance. The post-conviction court did not err by denying relief, and the Petitioner is not entitled to relief on this basis.

Relative to the Petitioner's intoxication at the time of the shooting, ample evidence was presented during the trial that the Petitioner had consumed alcohol the night before and the morning of the shooting. During closing argument, trial counsel discussed the Petitioner's drinking beer and vodka and getting little sleep the night before the shooting, which was presented through the Petitioner's testimony and the recording of Mr. Baker's police statement. Counsel also discussed the Petitioner's drinking beer on the morning of the shooting, which was presented through the testimony of Ms. Harrold and the Petitioner. Relative to whether the Petitioner acted with premeditation, counsel told the jury that the Petitioner "did not have a plan to go up there that day and do this. Instead he'd been out drinking all night. He got out there and things just happened." Although counsel did not tell the jury specifically that the Petitioner was too intoxicated to commit premeditated murder, counsel's argument reflects the Petitioner's intoxication played a role in the shooting. We note that no evidence presented at the trial or at the post-conviction hearing reflects the Petitioner's "severe intoxication." Ms. Harrold and the Petitioner talked on the morning of the shooting while drinking coffee, and Ms. Harrold never explicitly stated or implied that the Petitioner was severely intoxicated. We note, too, that the trial court instructed the jury relative to voluntary intoxication. The record supports the post-conviction court's general determinations that the Petitioner has failed to show that trial counsel provided deficient performance or that the Petitioner was prejudiced by counsel's performance. The post-conviction court did not err by denying relief, and the Petitioner is not entitled to relief on this basis.

### B. Appellate Counsel

The Petitioner alleges that appellate counsel provided ineffective assistance in his presentation of the sufficiency of the evidence issue to this court in the previous appeal.

However, the Petitioner presents no legal argument or citation to the record to support his assertion that appellate counsel provided deficient performance. Appellate counsel agreed at the post-conviction hearing that his argument for this issue consisted of six sentences.

The record reflects that appellate counsel argued in the previous appeal that the State would have been unable to establish the Petitioner acted with premeditation had the jury been permitted to consider Mr. Baker's recorded statement as substantive evidence. We note that the Petitioner has not alleged that trial counsel provided ineffective assistance by failing to make an offer of proof or to admit the entire recording into evidence, depriving appellate counsel of the ability to argue fully why the recording should have been admitted as substantive evidence. In a related issue, appellate counsel contended on appeal that the trial court erred by not admitting Mr. Baker's recorded statement as substantive evidence. This court concluded that any error in not admitting the recording as substantive evidence was harmless because the evidence of the Petitioner's guilt was overwhelming and that the recording "had no bearing" on the proof supporting the Petitioner's first degree murder conviction. *Malcolm Witherow*, 2013 WL 3353338, at *12. In determining that the evidence was sufficient, this court stated that cartridge casings and the victim's blood were found in the driveway leading to the roadway where the victim was found, that gunshot residue was found on the Petitioner's seatbelt, and that the victim's blood was found on the Petitioner's shoe. *Id.* at *9. The court also noted that after the shooting, the Petitioner drove to a mental health facility, where he reported that he had shot the victim and had disposed of the gun. *Id.* Although Appellate counsel's argument was noticeably short, this court considered the sufficiency of the evidence on the merits. Likewise, no evidence shows that the outcome of the appeal would have been different had counsel elaborated in his argument. The record supports the post-conviction court's determinations that the Petitioner has failed to show that appellate counsel provided deficient performance or that the Petitioner was prejudiced by counsel's performance. The Petitioner is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE